**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| v. ) | **CRIMINAL NO. 2:19-CR-212-DBH** |
| ) | |
| **JEANNE MORGANSTERN,** ) | |
| ) | |
| **DEFENDANT** ) | |

**DECISION AND ORDER ON MOTION TO SUPPRESS**

The issue on this motion to suppress is whether a pretextual but legitimate traffic stop justified a K-9 sniff of the stopped vehicle's exterior. The K-9 alerted to an odor of controlled substances; a resulting search of the vehicle's interior uncovered fentanyl and cocaine, which the defendant seeks to suppress. I conducted an evidentiary hearing on November 18, 2020, and subsequently the parties filed legal memoranda. I find that the state trooper who stopped the vehicle for a traffic violation was complying with an FBI and MDEA (Maine Drug Enforcement Administration) request that he do so in order that a K-9 sniff of the vehicle could occur. Although he did observe a traffic violation before stopping the vehicle, apart from some preliminary questions he quickly abandoned pursuit of any traffic violation and waited for a colleague with a qualified K-9[1] to arrive to conduct a sniff. I conclude that although the delay

---

[1] The state trooper testified that since Maine has legalized marijuana, the use of older K-9s trained to alert to controlled substances that include marijuana is problematic for some state district attorneys in arguing probable cause from the sniff. His K-9, Champ, has this disadvantage. Hr'g Tr. at 10, 57-58. So even though Champ was immediately available in his

was short, it was impermissible under Rodriguez v. United States, 575 U.S. 348 (2015). I therefore **GRANT** the motion to suppress what state troopers discovered inside the vehicle.

## FACTS

I find the following facts from the testimony and exhibits.

FBI and MDEA agents developed intelligence that on June 27, 2019, illegal narcotics were in a vehicle belonging to the defendant that was travelling in the vicinity of Hollis, Maine, where she lived. Her son was the target of the investigation. The agents sought the assistance of Corporal Adam Schmidt of the Maine State Police to arrange a traffic stop and conduct a K-9 sniff of the vehicle. Schmidt and Sergeant Jeremy Forbes[2] were both at K-9 training that day with their dogs. Schmidt asked Forbes and other troopers to assist. Schmidt told Forbes that the vehicle in question was a Chevy Tahoe and gave him the license plate number. He also told Forbes that a computer search of BMV[3] records showed that the plates belonged to a Chevy Silverado 1500.

Forbes traveled to Hollis and received information by phone or radio that the vehicle was at a nearby gasoline/convenience store location. He proceeded there and observed the vehicle in question turn past him driven by a woman not

---

cruiser, the trooper waited for another trooper whose K-9 had not been trained to alert to marijuana odor.

[2] Schmidt is still with the State Police; Forbes is now Deputy Chief of the York County Sheriff's Office.

[3] Testimony and conversations in the video sometimes refer to Maine's Bureau of Motor Vehicles as the "DMV." This decision refers to the agency as the "BMV" throughout, regardless of which acronym the declarant used.

wearing her seatbelt. He pursued the vehicle and pulled it over to the side of the road for the seatbelt violation. Hr'g Tr. at 32, 53.

After parking his cruiser behind the vehicle, Forbes walked up to the driver's window and asked the driver (the defendant) why she was not wearing a seatbelt. She admitted the infraction.[4] He asked for her driver's license, vehicle registration, and insurance. She produced her driver's license but was unable to locate her registration and insurance card. He testified that her failure to produce registration "furthered my belief that the plates were not properly attached to that vehicle, which is a criminal violation."[5] Hr'g Tr. at 19. He asked for her cell phone and took it and her driver's license back to his cruiser. He testified that taking her cell phone had nothing to do with the seatbelt and plates violations, but he was concerned that the defendant might call her son, the target of the narcotics investigation or, since Forbes believed that narcotics may be in the car, she might call someone else to come who might be capable of harming the state troopers. Id. at 21, 54-55. He did not attempt to ascertain the vehicle's VIN, ordinarily visible through the windshield on the dashboard.[6] Id. at 43-44. He also testified that he observed an expired inspection sticker, but whether he

---

[4] Forbes testified that he usually tries to get the person "to admit the violation on my audio . . . . I like to get that first so, you know, it's a legal stop, obviously." Hr'g Tr. at 33.

[5] Forbes testified that there was discussion about the plates at this stage, while the driver was still in the vehicle, and that the driver said BMV had made a mistake in describing her car as a Chevy Silverado. Hr'g Tr. at 25. The government argues that Forbes was mistaken because such a conversation cannot be heard on the dashcam audio until after the defendant had exited the vehicle. Gov't Post Hr'g Br. in Opp'n at 13 n.4 (ECF No. 90). Whether the discussion was early in the stop or near the completion of the dog sniff does not affect my analysis.

[6] "The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" New York v. Class, 475 U.S. 106, 114 (1986).

informed the driver is uncertain.[7] The encounter by the driver's window lasted two minutes and forty-five seconds according to the clock on the trooper's dashcam. Gov't's Ex. 1 (1:30 to 4:15).[8]

Forbes testified that his standard procedure in a traffic stop is to ask for the driver's license, registration, and proof of insurance, look at the insurance card to determine if it is valid and return it to the driver, then take the driver's license and registration back to his cruiser where there is a computer terminal, run a check on the license to see if it is valid and to determine the driver's driving record, run the registration to see if it is active and if the plates are correct and if the registration has the same VIN as the car, determine whether to write a ticket, and if so, do the paperwork. When Forbes proceeded back to his cruiser on this occasion, however, he did none of that. Instead, he called Corporal Schmidt who was en route with his K-9 Ibo for the drug dog sniff "as far as coordinating his response to the scene," then spoke to some of the drug investigating agents and discussed whether a second vehicle may have been involved. Hr'g Tr. at 22, 37; Gov't's Ex. 1 (4:25 to 6:00).

After one minute and fifty-five seconds (4:15 to 6:10 on the dashcam clock), when Schmidt had not yet arrived with his K-9, and without doing any of his standard investigation into the driver, the vehicle, and the plates, Forbes returned to the driver's window, asked the driver to cooperate (he testified he

---

[7] On direct examination, he said "I believe I asked her [regarding the expired sticker], but I don't recall exactly how I worded it." Hr'g Tr. at 20. On cross-examination when asked: "Do you recall having any conversation with Ms. Morganstern about the expired inspection sticker?" he answered: "I do not." Id. at 62.
[8] The video was taken from the front of Forbes's cruiser; the audio is from two microphones, one in the cruiser and one on the trooper's belt. Hr'g Tr. at 9, 30.

meant in connection with the narcotics investigation), asked if there was anything illegal in the vehicle, asked if he could search the vehicle, asked her to get out of her vehicle because a K-9 was coming to do an exterior sniff, and—because of confusing information he heard over the radio traffic from the investigating agents—asked if anyone got out of her vehicle at the gas station/convenience store (thinking it might have been her son, the target). Gov't's Ex. 1 (6:10 to 7:40). She refused to get out of the vehicle, refused to consent to a search, and denied there was anything illegal in the vehicle or that anyone else had been in the vehicle. Id. Forbes testified that at this point his focus was the narcotics case, not any driving or vehicle infractions. Hr'g Tr. at 61-62.

Once Schmidt arrived (he appears on the video with his dog at 7:40 on the dashcam clock), the two troopers again asked the defendant to get out of her vehicle. They testified that this was because Schmidt prefers to conduct a K-9 sniff with passengers out of the vehicle. The defendant refused and the troopers told her they would forcibly remove her. Then she began to get out, holding her bags. Forbes told her that if she removed bags from the vehicle, he would search them for officer safety. She left them in the vehicle, and Forbes escorted her away from the vehicle and off the road and stayed with her. Schmidt then led his K-9 Ibo on a counterclockwise circuit of the vehicle starting from the front. The dog jumped up at the driver's open window but did not formally alert. It also jumped up at the vehicle's trunk. After a complete circuit, Schmidt then followed his standard procedure of leading Ibo on a clockwise circuit and

5

encouraged the dog to "target"[9] its attention on various locations. Generally he did this by pointing at the area he wanted the dog to focus on. In his testimony he said that he did not recall whether he actually touched the vehicle in targeting, but the dashcam shows that he did, at least at the driver's door (10:28-10:30 on the clock). On this second circuit, Ibo formally alerted at the driver's door. Gov't's Ex. 1 (10:34). Thereafter, the troopers searched the entire vehicle and found the narcotics in the defendant's purse in the passenger compartment.

## ANALYSIS[10]

Stopping a vehicle for a traffic violation is akin to a Terry stop. United States v. Dion, 859 F.3d 114, 123 (1st Cir. 2017) ("A routine traffic stop is more akin to a Terry stop than an arrest."). This traffic stop was legal. Although Forbes wanted to stop the vehicle to pursue a narcotics investigation, he personally observed the seatbelt violation and was entitled to make the traffic stop accordingly. See Whren v. United States, 517 U.S. 806, 813 (1996) (if objective basis for the traffic stop exists, constitutional reasonableness does not depend on law enforcement officer's actual motivation); accord State v. Sasso, 2016 ME 95, ¶¶ 9-11, 143 A.3d 124.

---

[9] Schmidt testified that "targeting is us pointing to areas of a vehicle or, you know, it could be inside of a residence, for example, just to ensure that the dog is conducting a thorough sniff of the vehicle." Hr'g Tr. at 83. When asked how he targeted, he said "I point to the area." Id.

[10] The government has chosen not to offer in its case-in-chief any statements the defendant made after the stop. I therefore do not address them. The government also has chosen not to argue that it had probable cause for the stop and search on the basis of the FBI and MDEA investigation or that the troopers developed probable cause or reasonable suspicion concerning narcotics during the traffic stop but before the K-9 sniff. Instead the government relies solely upon a valid traffic stop coupled with a K-9 sniff of the exterior of the vehicle to generate probable cause for the ensuing search of the entire vehicle. The defendant has not challenged the credentials and training of Ibo and Corporal Schmidt.

Two United States Supreme Court cases frame the analysis of whether a K-9 exterior sniff of a vehicle legitimately stopped for a traffic violation is a Fourth Amendment search or seizure that requires probable cause or a warrant.

In <u>Illinois v. Caballes</u>, 543 U.S. 405, 408 (2005), the Supreme Court said that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [the driver's] constitutionally protected interest in privacy." In <u>Caballes</u>, the driver who was stopped for speeding was in the cruiser with the state trooper while the trooper "was in the process of writing a warning ticket" for speeding. <u>Id</u>. at 406. During that time, a different officer walked his dog around the speeding driver's car and the dog alerted at the trunk. <u>Id</u>. The Court noted that "the dog sniff was performed on the exterior of [the driver's] car while [the driver] was lawfully seized for a traffic violation. Any intrusion on [the driver's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." <u>Id</u>. at 409.

Ten years later in <u>Rodriguez v. United States</u>, 575 U.S. 348 (2015), the Court elaborated on <u>Caballes</u> and held:

> a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

<u>Id</u>. at 350 (quoting <u>Caballes</u>). Further, the Court stated:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction

7

> is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

Id. at 354 (citations omitted).

The purpose of the traffic stop Forbes engineered here was to determine if the targeted vehicle was carrying illegal narcotics. That purpose does not make the stop illegal or improper, however. Once Forbes observed a state traffic or vehicle violation, he was entitled to stop the vehicle and pursue the violation to its proper outcome, whether that was a ticket, summons, warning, or arrest. His engaging the driver to admit her seatbelt violation and requesting her driver's license, registration, and insurance card were all proper parts of that process. According to Rodriguez:

> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.
> A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." . . . . Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

Id. at 355 (citations omitted). However, taking the driver's cell phone was not part of the traffic violation mission, as Forbes testified. And once Forbes returned to his cruiser with the driver's cell phone and driver's license, he abandoned the traffic or vehicle violation mission altogether. Instead, in pursuit of the narcotics investigation, he engaged by phone or radio both Schmidt who

would conduct the dog sniff and the drug agents.  He then returned to the defendant's vehicle before Schmidt arrived and engaged the driver in questioning that had nothing to do with traffic or vehicle violations and everything to do with the narcotics investigation.  Unlike in Caballes, Forbes was not in the process of writing a ticket while Schmidt conducted the K-9 sniff.

The First Circuit applied Caballes and Rodriguez in United States v. Dion, 859 F.3d 114 (1st Cir. 2017).  Referring to Caballes and Rodriguez, it said that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns"; police "can undertake checks unrelated to the purpose of the [traffic] stop so long as those checks do not prolong the stop." Dion, 859 F.3d at 123-24 (cleaned up).  Moreover, "a seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation"; "any action undertaken with respect to the stop must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation." Id. at 124 (cleaned up).  The government has not argued that the troopers had a basis before the dog sniff for expanding their investigation into narcotics.

The government makes two alternative arguments to support Forbes's waiting for Schmidt's K-9 Ibo to sniff in this case: first, that in addition to the seatbelt violation, Forbes had probable cause to arrest the defendant for illegal plate attachment; second, that pursuing all the available traffic infractions (if

Forbes had pursued them) would have taken 30 to 45 minutes, see Hr'g Tr. at 29, far longer than the K-9 Ibo sniff.

As for the first argument—illegally attached plates—Forbes testified that in enlisting his assistance, Schmidt told him that the plates were "improperly attached" to the Tahoe and that "when [Schmidt] ran the plates it came back on a Chevy 1500, which would be a pickup truck." Hr'g Tr. at 11. However, Forbes never testified that he stopped the vehicle for improperly attached plates, but rather for his seatbelt observation, which he characterized as a "clear violation." Id. at 33. He did testify that the driver's failure to produce registration "furthered my belief that the plates were not properly attached to that vehicle, which is a criminal violation." Id. at 19. But he never checked the VIN on the vehicle's dashboard to run it through his cruiser's computer to determine whether the plates actually belonged to the Tahoe. Instead, he abandoned any investigation into the propriety of the plates while waiting for and accomplishing the dog sniff. About an hour later, well after the driver had been arrested for the narcotics and taken to the County jail, Forbes removed the plates when the wrecker arrived to tow the vehicle. He returned them to BMV, believing (still without checking) that they had been attached improperly. The next day he learned that they had been properly attached to the vehicle and that BMV had made an error in describing the vehicle in its records.

Because I conclude that the stop was improperly delayed at the outset for the dog sniff, the role of the plates is irrelevant. I reject the government's construct that because Forbes *could* have arrested the defendant for illegal plates when she failed to produce registration, he was then entitled to detain her for

10

the dog sniff. In <u>Rodriguez</u>, the Supreme Court was explicit: "We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. at 350. Whether the stop was for seatbelt or plates or both, Forbes could have run the VIN on his computer or written a ticket or both. Instead he did neither; after the initial driver's window encounter, he turned instead to the narcotics investigation. The <u>Rodriguez</u> Court rejected the dissenters' argument for applying an overall reasonableness standard to the duration of a traffic stop and said: "The reasonableness of a seizure . . . depends on what the police in fact do." <u>Id</u>. at 357.[11]

As for the second argument—that a stop of 30 to 45 minutes was justified because that was the ordinary time to complete writing up all the infractions—that too is inconsistent with <u>Rodriguez</u>'s focus "on what the police in fact do." What the state troopers "in fact" did to complete the traffic stop mission in this case was nothing, but for the initial driver's window encounter. Everything after that was outside the "mission" and therefore amounts to improper delay for the dog sniff in the absence of probable cause for narcotics, a warrant, or a reasonable and articulable basis for suspicion of narcotics.[12] It is true that

---

[11] I also note that the government has not argued that the search of the vehicle was incident to a lawful arrest.

[12] <u>Rodriguez</u> rejected the Eighth Circuit's "de minimis" rule and the government's argument in that case that "an officer may 'incremental[ly]' prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." 575 U.S. at 357. Instead, the Supreme Court said: "The Government's argument, in effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. The reasonableness of a seizure, however, depends on what the police in fact do. . . . If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete

Rodriguez spoke of "when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. at 349. But that was in the context of setting a limit on the length of the stop, not prolonging it.

Most Circuits seem to say that when law enforcement conducts an inquiry about crimes unrelated to the traffic stop and the process adds time to the stop without a reasonable suspicion for the inquiry, then the stop is unlawfully prolonged. See United States v. Stewart, 902 F.3d 664, 674 (7th Cir. 2018), reh'g en banc denied (Oct. 26, 2018); United States v. Clark, 902 F.3d 404, 410-11 (3d Cir. 2018); United States v. Bowman, 884 F.3d 200, 219 (4th Cir. 2018); United States v. Gomez, 877 F.3d 76, 88-93 (2d Cir. 2017); United States v. Gorman, 859 F.3d 706, 715 (9th Cir. 2017); United States v. Macias, 658 F.3d 509, 518-19 (5th Cir. 2011). But see United States v. Collazo, 818 F.3d 247, 257-58 (6th Cir. 2016) (suggesting an overall reasonableness standard).[13] That is the situation here. Forbes was pursuing an inquiry unrelated to the seatbelt

---

the stop's mission." Id. (cleaned up). Even if Forbes had pursued the traffic violation, his interruption of that mission to contact Schmidt and the drug agents impermissibly prolonged the traffic stop, as did his waiting for Schmidt while proceeding to question the driver with respect to the drug investigation. In United States v. Ramdihall, 859 F.3d 80, 91 (1st Cir. 2017), there was a six-minute delay after the officer completed the traffic ticket and waited for the K-9 to arrive but, unlike here, there was "a reasonable and articulable basis for suspicion justifying that additional six-minute delay."

[13] The Eleventh Circuit thus summarized these cases in United States v. Campbell, 970 F.3d 1342, 1355 (11th Cir. 2020). Campbell found an illegally prolonged stop but did not exclude the evidence resulting from the dog sniff because it concluded that law enforcement there acted "in objectively reasonable reliance on binding appellate precedent." Id. at 1357. The opinion has now been withdrawn because the Circuit has decided to consider the case en banc at the defendant Campbell's request. Id., reh'g en banc granted, 981 F.3d 1014 (Dec. 2, 2020). The Third Circuit dealt with a case where the officer returned to his vehicle after a brief initial conversation with the driver and made an unrelated phone call to a colleague about drug trafficking, not speeding. The Third Circuit concluded that a "prudent" reading of Rodriguez led it to assume (an "assumption—not conclusion") that the officer's actions after the initial conversation with the driver improperly delayed the traffic violation investigation. United States v. Green, 897 F.3d 173, 182 (3d Cir. 2018).

violation or improper plate attachment. In doing so, he added time waiting for Schmidt and Ibo when he did not have reasonable suspicion of narcotics.

Because I conclude that the delay for the dog sniff runs afoul of the Supreme Court and First Circuit standards, I do not address the following issues that the defendant has raised:

1.   A Maine statute explicitly provides: "A vehicle, the contents of a vehicle, the driver of or a passenger in a vehicle may not be inspected or searched solely because of a [seatbelt] violation." 29-A M.R.S.A. § 2081(3-A). The parties have not provided any Maine Law Court cases discussing whether the statute prohibits state troopers from conducting a K-9 exterior sniff or requiring a driver to leave her car during a seatbelt violation stop. One Superior Court case holds: "Because this subsection provides that a vehicle or person may not be searched *solely* because of a violation of the seatbelt requirement, the agents cannot rely on the seatbelt violation to stop a driver in order to investigate a hunch that the driver is engaged in illegal drug activity." State v. Stuckey, No. CR-09-8567, 2010 WL 3830833 (Me. Super. Ct. June 11, 2010). On the other hand, the government argues that federal Fourth Amendment law, not state statutory law, governs in this federal prosecution, citing United States v. Graham, 553 F.3d 6, 17 (1st Cir. 2009), and Virginia v. Moore, 553 U.S. 164, 170-78 (2008). Gov't's Post Hr'g Br. in Opp'n at 17.

2.   In United States v. Jones, 565 U.S. 400 (2012), the Supreme Court held that affixing an object to a vehicle's exterior in order to gather information about the vehicle's movement was a trespass that amounts to a Fourth Amendment search. I do not decide whether Corporal Schmidt's touching the

car with his hand to target K-9 Ibo's sniffing at particular areas in order to get odor information about the presence of narcotics inside the car amounts to a <u>Jones</u> search.

I **GRANT** the motion to suppress.

**SO ORDERED.**

**DATED THIS 22ND DAY OF DECEMBER, 2020**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**